The next argument for today is 2019-20723, Corey Prantill et al. v. Arkema Incorporated. You may proceed with your argument. Thank you, Your Honor. The District Court expressly found that plaintiffs employed quote, a biased sampling method that cannot be reliably extrapolated to the whole class area, unquote. That's at page 43 of the excerpts of record. That finding should have been the end of this class action because it means that there is no way for plaintiffs to establish exposure, causation, injury, and damages on a class-wide basis. The parties would instead have to perform sampling and then litigate these issues for every single one of the 20,000 properties that are within the 154 square mile class area. Just as in Ebert, Gates, and Cannon, that kind of property-by-property inquiry would swamp the single common issue of whether Arkema satisfied the applicable standard of care. The District Court nonetheless brushed aside this fatal defect in plaintiff's case by positing, sua sponte, that class members are likely to move about the class area and be exposed to contaminants even if they don't have a single particle on their properties. That was an abuse of discretion for multiple reasons. First, it makes no sense in connection with the 23b3 class, which is limited to economic damages for diminution and property value and response costs. Second, there was no evidence to support the court's premise that every member of the class would necessarily move about the class area and regularly encounter unsafe levels of contaminants. Third, this rationale ignores the undisputed evidence that the vast majority of plaintiff's samples did not contain any contaminant of concern in excess of background levels, much less in an amount that could give rise to health concerns. And the court also ignored the undisputed evidence that the contaminants of concern are ubiquitous in the environment and have many other sources within the class area. I should note in this regard. I have a question about that. If you're going to say it's ubiquitous and has other sources and things, I'm wondering, is it, is your position only that because of this sampling method, this bias sampling method that you called it, that this case itself is fatally flawed from the get-go? Or are you saying that any such case is fatally flawed because of all these other aspects? Well, certainly this case is fatally flawed because what they tried to do initially was who it turned out was manipulating the inputs and producing the outcome that his clients were paying him to produce. So he had to be withdrawn. And that's why they have these inadequate samples, because they never tried to do it through a proper sampling program. But I think more broadly, it would be exceedingly difficult given the size of this class area and the nature of this kind of release to ever establish that kind of common injury. After all, the particles move with the wind and the wind isn't blowing commonly. It's not just blowing around in circles, covering a certain circular area. So I think, you know, there are environmental cases that could demonstrate common exposure, injury, and causation. And one example, which is cited several times by the district court in its opinion, is the Murphy oil case. If you have a release of a visible substance like oil from a refinery, and it goes into a body of water and then washes up on people's properties, you can visibly see that they've been commonly affected. But when you're talking about what's basically invisible particles that could have gone anywhere, I think it's almost impossible to certify that kind of class, and certainly not one that's 154 square miles. Let me ask you this, because I think there's a core issue in this case. You know, in the typical pollution case, if you will, it's over time. There's other entities that are polluting. All of the conflicts and concerns that you raise, you know, are inherent. This one, they're focusing on a particular day and the preparation for that day, or lack of preparation, as they would say it. Why isn't that question of, did Arkema fail to do what it needed to do to keep the trucks refrigerated and whatnot, why isn't that a common question that is dispositive? If they did what they were supposed to do, everybody's done. If they didn't do what they were supposed to do, then we move on to all of this stuff that's in the air, literally and figuratively. Well, it is. That's the common issue that we stipulated existed. But under this court's case law, predominance has to be established for the case as a whole, not for one issue. And you're supposed to look at the way the case would be tried, which is something that without having 20,000 trials to establish, were they exposed? Do they have the contaminants of concern on their property? Are they in excess of background? If so, are there potential alternative sources? There was abundant expert testimony in this case, all of which, by the way, the trial court ignored, discussing the alternative sources and how the plaintiff's experts had not done anything to rule them out. One of the many errors committed by the trial court was failing to waive the evidence of both sides. The court treated it effectively as if it was a summary judgment, and it looked at the plaintiff's experts' testimony and never looked at our sides. And if the court wants to be persuaded of that, I urge you to read the Newfields report, which will be found at pages 53, 56, to 54, 50 of the record on appeal. That report demonstrates in minute detail and with devastating effect why the assertions of plaintiff's experts that the district court uncritically accepted are scientifically invalid. So that's one of the many things that the court got wrong in certifying this class. He just didn't even look at the evidence that we put on. And I would contrast that with the decision in Yates v. Collier, which the appellees rely on several times in their decision because there the trial court looked at both sides' evidence in great detail, and that allowed this court to review it properly for an abuse of discretion and to say, we don't think that the trial court abused its discretion by looking at the evidence and deciding that the plaintiff's case was more credible than the defendant's. Nothing like that took place here. So can we remand for the district court to do more work, or are you saying that more work can't be done? Well, I don't think any further work would make a difference, even if they were to start over, which I don't think they should be allowed to do. They had their bite at the apple. In this respect, the cases like the gene and gene case, where this court reversed a class certification and said in the conclusion for further proceedings, not inconsistent with this court's opinion. And then the trial court gave the plaintiff a second chance to try to establish the requirements for class certification with new evidence. And then it got appealed back up, and this court said, no, that's not what we meant. You don't get to do it again. So even if they could, which I don't think, for the reasons I said before, they ever could in a case in which they're overreaching by so much to try to get such a big class area, that they could ever establish with common evidence the exposure, the causation, the injury, and I should say damages. This court has said many times that individualized damages, even all by themselves, might be sufficient to defeat predominance. True, in Deepwater Horizon, they said it wasn't enough. But far more often, this court has said it can be enough. And here, on top of that, we have individualized issues going to liability. If the court permits... That's the causation. The individualized issues are the causation? Causation and injury. Injury, as distinct from damages, is an element of each of the causes of action. So did that particle land in my yard or not, is what you're saying? Well, and I think it would have to be in the excess of background at minimum. So if they find... Did a big bucket of that land in my backyard? And I don't live in this area, so don't misunderstand me. Did the bucket of that land in plaintiff one's backyard? That's your point. That, they would have to establish that. Then we would have to go into, well, you wouldn't know did a bucket land. You'd just know it was there. So then the next question is, well, how did it get there? Because as I said, there are many alternative sources. These chemicals... Well, that's the causation. You were distinguishing causation and injury. Right. You're correct. Bucket was trying to understand the injury. Causation is, how'd the bucket get there? Right. So both exposure is if there's anything. Injury is if it exceeds background. And then causation is after you rule out alternative sources. And then, as I said, there's also the individualized issues of damages, which, by the way, would also include, under Texas law, apportionment to responsible third parties. So if, for example, there were releases from other refineries, as there were, those would have to be taken into account. And it would vary from plaintiff to plaintiff, depending where you live in this seven-mile radius circle. In some parts of the circle, you're quite close to refineries. In other parts, you're right on the railroad tracks or Route 90. All of those are known sources of the very same contaminants of concern that the plaintiffs are alleging came from Arkema's facility. Maybe this isn't relevant, but isn't there kind of an overarching fear that Arkema would just get away with its negligence if it can defeat a class action this easily? Well, I don't think there should be any fear of that. They've been sued in individual suits. And if you notice in the case gets decertified, so they're not going to get away with it. And I should also say that Arkema has been in this area for a long time, and they pride themselves on being a good neighbor. And when people call them up and say, we've got stuff on our property, they come and they look at it. And if they think it's theirs, they clean it up. And, you know, they've already cleaned up the wastewater damage under the supervision of the Texas authorities, and they've received a no further action letter. So some of these, they're not going to get away with anything, even if they did do something wrong, which is a whole separate issue of liability that, you know, isn't in play here. But, you know, as everyone knows, that was a once in 2000 year storm. So getting away with not being prepared for that kind of storm is not like getting away with a scheme to fraud people. I don't have much- Counsel, how do you distinguish the deep water horizon where predominance was satisfied by virtue of a bifurcated trial plan, and that there were other factors in that case that they argued caused the decline in the property values and things there? How do you distinguish that? Well, two things. First, it's inconsistent with prior Fifth Circuit law, Costano and Allison, among others. I think- So you think that case is just out of sorts? Yeah, well, if you look at it both before and after deep water horizon, this court has said the predominance inquiry applies to the entire case, not just to, you know, the common issue the court identifies. But- So you don't distinguish it, you just think it's out of, that we didn't follow our precedent. Is that the answer to the question? No, no, I'm going to distinguish. I'm going to distinguish now. The panel felt that- the panel identified a lot more common issues than exist in this case. The common issues had to do with the design of the well, how the explosion occurred, the discharge itself, the cleanup efforts, the roles of multiple parties. All of that would be the same for each plaintiff who's making a claim for lost income. Uh, here, the common issue is just, did we breach a standard of care by not anticipating this flood? Thank you. You've saved time for rebuttal, and I- and you can continue on your rebuttal with anything else you want to say about that. Okay, thank you, Your Honor. Thank you. You may proceed with your argument. Good morning, Your Honors, and may it please the Court, Samuel Issacharoff for the plaintiff, Prantil, et al. I think the heart of the case is the question that Judge Elrod asked at the very end. Does this court permit a bifurcated trial plan in a mass environmental harm case? Uh, calculations. There will be secondary proceedings that are necessary to the final disposition of this case, but this court in Deepwater Horizon and in several other cases has said that when all the issues that go to the liability are common, that a bifurcated trial plan is the effective way to handle the case. Indeed, the, uh, the appellants relied upon an unpublished decision of this court, which we did not invoke because it was unpublished, but I would like to turn to at this point, which is the Robertson v. Monsanto case, in which you had a similar type of single event exposure question and an environmental case. And this court denied class certification there, but did so because all the liability issues had already been resolved before it came to the court. And if I can read what this court said, it said, if a usual class action were to be used in accordance with the usual class action method of resolving mass tort claims of this type, the proceedings would most likely be bifurcated to try the common issue of liability on a class-wide basis, and then to allow for the presentment of individualized proof on the questions of proximate causation and damages. And this court relied on the two leading treatises in class action law, the Newburgh treatise and And it relied on exactly the same provisions of those treatises, leaving aside that they have moved over in subsequent edition, but the exact same provisions of those treatises that were relied on by this court again in Crutchfield, and that were relied upon by the U.S. Supreme Court in the Tyson Foods case. And what those provisions establish is that there is increasing comfort in courts around the country and increasing law in the courts of appeals that allows for precisely what the district court did here, which is to find that all of the issues of liability, quoting this court's Bertulli decision, all of the issues of liability would focus on the defendant's conduct. We don't have questions of contributory negligence here. We don't have any aspect of any plaintiff's behavior. Mr. Trager said at the very end of his argument, if they did something wrong, if they did something wrong, and their contention is there was no negligence, there was no strict liability. This is a once in a 2,000-year flooding event, which incidentally, there have been three 2,000-year flooding events in the Houston area in the last 10 years. So there is a significant question whether they acted in conformity with what would be the appropriate standards of care for a facility operating such ultra-hazardous activities. But if that's the question, and that's a question that's not only before this court, it's a question that's before the state courts and the 700 proceedings there, and we submitted a demonstrative to this court showing how they characterize the cases in the Texas state system in exactly the same way that the district court did here, which is to say at the liability stage, they're all the same case. They all present the same evidence. They all ask the same questions. There's no variation between them, and that is what the district court found here, and we assertions in the Texas state court system that go in exactly the same direction. So the question is whether this court could ever allow a predominance inquiry to be satisfied in a bifurcated trial proceeding. Now, certainly, there are many cases in this court that reject predominance findings, but they fall into certain patterns, and the patterns distinguish this case in the way that Judge Haynes indicated set this case apart. So, for example, you have multiple cases, beginning with Castano and most recently the Cruzon case, where you have choice of law issues, where you have multiple legal standards that have to be assessed at the same time. This case presents no such issue. There are two federal statutes and a series of Texas common law claims, and that's it. It's all one body of law that governs this. There are cases that deal with personal injury or emotional distress, and almost all the cases that fail as class action cases in these kinds of mass harm cases are those which raise the personal inquiry as to emotional distress, personal consequence, personal vulnerability that may follow. The third is where there are multiple defendants, and this court in the Deepwater Horizon case actually went a step beyond where many courts have gone in allowing a case to go forward as a class action and recognizing that a trial plan could successfully manage even when there were multiple defendants present. The fourth one is when there's a stretched out time horizon, so that in cases like the Monsanto case or in cases like the cases they rely on from out of this circuit, the Gates case and the Ebert case from the third and eighth circuits, those are cases where the toxic exposure, this is exactly the question that Judge Haynes asked, the toxic exposure was something that occurred over decades and decades and decades, and we don't know exactly who was exposed when or when the harm ceased or what other actors may have come into this. And finally, the most critical failing in the predominance involves cases where there is about the way the plaintiff responded that is dispositive, and that's clearest in the reliance cases. And so they rely heavily on the eBay case, which is a case about Super Bowl tickets of all things. And it's a case in which somebody got moved from one place to another, says, my view, my sight line was not as good. You told me this. I didn't expect that. That's the classic. What did I anticipate? What representations was I relying on? This case has nothing to do with it. And in Crutchfield, this court said, we have upheld certification of class actions in certain mass tort cases. They involve single episodes of tortious conduct, usually committed by a single defendant. That's what this case is. Single event, single defendant, single overarching question of are they responsible? And not only are we pursuing this in this fashion, but there is criminal procedures going on that were unfortunately disrupted by the COVID emergency. There are criminal proceedings going on against Arkema and two of its officers, including its CEO, on exactly the same question. Are you responsible or not? That's the critical question in this case. Now, in their brief, twice, and then in their reply brief once, Arkema asserts that this court has a per se rule, a nearly per se rule, that environmental torts are inappropriate for class certification. The first time they assert this, it's bereft of citation. The second time they assert it, they cite to three cases from this court. If one looks at those citations, each one is a citation to the 1966 advisory committee note that says generally mass accidents are not appropriate for 23B3. That may be, but that has nothing to do with this case. It has nothing to do with the experience of this court in handling environmental cases in this fashion. And most environmental catastrophe ever brought to the courts, which is of course the Deepwater Horizon case. Well, I will say this, that case was settled and we were dealing with a settlement, and so it's been supposedly settled. And I would say every OA sitting I have, I have at least one BP case. So clearly it's still going on. So whether that, I mean, I don't know whether that was a great way to handle it or not, but it was a settlement. I can't even imagine if they were 22,000 cases or whatever it would have been because just the opt-outs and the disagreement over settlement processing has created a huge amount of work for the district court and for our court. Yes, it has, Judge, and I am not unfamiliar with the Deepwater Horizon litigation. I spent quite a bit of time before your honors in various instances of that. And I can say that the question is always what the alternative is. That's what the predominance inquiry asks. And it is not that this will all go away if the class is certified or that there will be a lot of work to do. Believe me, the work that this court had to do in Deepwater Horizon was not caused by the class certification order, but by the explosion on the oil rig. And the oil rig gave rise to massive numbers of cases brought by states, brought by municipalities, brought by individual businesses, brought by all sorts of entities. And the question was whether that was an efficient, effective way of handling the dispute. And yes, the bulk of it settled. And based upon that settlement, issues were narrowed, but there were pieces of Deepwater Horizon that went to trial. There were two trials held in Deepwater Horizon. There were the personal injury case, the death cases that were settled outside the framework of the class action. So the issue, and Mr. Trager keeps raising this, there will be so much work to do. The reason there's a lot of work to do is that a chemical plant exploded in Crosby, Texas, and that's a prohibited event. That should not have happened. It's a malum in se. It is, you know, res ipsa loquitur. There's all these terms that should not happen. Now they say, act of God, force majeure. Nobody could have anticipated this. We submit every other chemical plant in the area did anticipate this, did shut down production ahead of time. And what the question, what the scope and the nature of their negligence is, is a matter that has to be addressed. Now, the only issue, Judge Haynes, is not whether the class action will resolve everything, but whether the liability has to be proven again and again and again. And we recommend to this court's attention the decision of the Seventh Circuit in the Metcoil case, because that really is an opening for this entire area of law. Metcoil was written by Judge Posner. Judge Posner previously wrote the Ronpilonk decision, which this court relied heavily upon in Castano. And Ronpilonk focused on choice of And this court was deeply influenced by that in Castano. Ronpilonk is a case in which there's a toxic release. And the issue is, does the plume from the toxins fall into an aquifer or not? And Judge Posner and Mr. Trager's brief says he does this under C-4. That's just wrong. There's is, there's only one issue that controls in this case. And that's the question of, did the plume hit here or not? Did the plume hit the aquifer or not? Now, he acknowledges in that case that subsequent work will have to be done. So for example, it will have to be determined whether individuals draw some or most or all of the water from the aquifer, whether there were in Metcoil, drew their water directly from Lake Michigan, so they would not have been affected under any circumstances. But there is no guarantee that everybody will win. What the predominance inquiry does in a bifurcated proceeding, if this court allows bifurcated proceedings, which it certainly seemed to indicate in Bertulli, in Deepwater Horizon, in Robertson, in Crutchfield, but if it allows bifurcated proceedings, that means that the application of that will go to a second phase. And that second phase can take many forms. There can be a settlement there, which is what usually happens. There can be some kind of administrative proceeding. Mr. Tager's brief and echoed, unfortunately, by the Chamber of Commerce says, oh, no, oh, no. At that point, we're going to have statistical sampling. We're going to have by formula. This violates Duke's. There's no mention in the district court's opinion of trial by formula. What the district court says in the phase two, we will figure out if there is liability, how to get to the damages portion of it. And the district court uses invokes court put that off when it certifies a class put off the well. We'll worry about that later. Doesn't it have to lay out the pathway? It lays out some pathways. And the efficiency gain is that if the plaintiff, the defendants prevail at trial, we never get there. So we don't have to do a lot of work. But the but the what the trial court said was we could have some bellwether trials, which is the classic mechanism that's advanced by the by the federal judicial center in the manual on complex litigation. That's what courts use routinely. That's not trial by sample. I'm sorry. That's not trial by by statistics. That's trial by let's see how much one of these cases is worth. And let's see what the jury comes back with in a few of them. And then we can we can figure this out. It's true that each property was individualized at an individualized harm or not. Then how would the bellwether be appropriate here? The bellwether would tell you whichever trials went forward as bellwethers. It would say juries find that this is a significant harm. It is not significant. The Arkema briefs intimate that there's such a toxic stew that is ever present in this part of East Texas, that no harm was done anyway, that all these things are present there, including other metals that don't matter, that weren't an issue here like arsenic. But the question what the what that will do is the evaluation and parties settle on the basis of common understandings all the time, or they can agree to an ADR proceeding. They can agree to all sorts of things. Once the central question of liability has been determined on the central question of liability, Mr. Tager keeps insisting that there is no evidence before the district court. And that is not correct. And here again, and it's the only place where I will invoke this. The standard of review is important because it's a highly deferential. The district court held extensive hearings, has a massive factual record before it. But Mr. Tager relies on two things as our air expert did not do a complete sampling and so forth. We relied below on the work that was done by the Trinity firm, which confirmed to a distance of 6.8 miles that there was ambient particles of the toxins released from the Arkema plant up to a level of 60. Now, these don't just sit in the air, they emanate from the ground. And so on that basis, we define the class zone as the seven mile radius. And if there are these metals present, then we will go back at the appropriate time and find out exactly where the hotspots are and all that. That is a class methodology. That's all that's required here. Mr. Tager says, well, we have evidence to the contrary. Of course they do. But that's not what the class certification hearing is for. That's what the Supreme Court rejected in Amgen as the cart before the horse. That's what summary judgment is for. That's what trial class actions don't have to win. Yes. I have a question. If we were to determine just hypothetically, that while the district court laid out some pathways, there's some pathways that weren't laid out sufficiently. Should we send it back for the district court to lay those pathways out or should or do you want us to rip the bandaid off and decide for one one way or another whether we allow bifurcated proceedings? Well, your honor, I would prefer if this court is going to say you do not allow bifurcated proceedings and that the prior opinions in Bertulli, in Robertson, in Crutchfield and Deepwater Horizon were wrong, that this court come out and say it right away because let's not waste time and money. If that's the rule of this court, then it should say so. It would be difficult. I said you have a number of you have a point is that we have a number of cases where we seem to have done that. So it would be odd for us to do so now. I think it would be more than yes, your honor. If I could just finish this thought, I think it would be more than odd. I think it would be one panel overruling the law that seems to have been understood by prior panels as controlling in this circuit. And that was certainly applied not just in dicta, but applied as part of the litigated proceeding in Deepwater Horizon. And that issue was one of the many issues that was presented for en banc review by this court from Deepwater Horizon and rejected there. But if you find that there are particular applications and given the paucity of actual case law on this point, they're very well made. Then, of course, we should go back and have the chance to perfect the record under however this court elaborates the legal standards of this court. Thank you. Thank you. Thank you very much. You have your argument. You save some time for rebuttal, counsel. Thank you, your honor. To start with the point that you just wrapped up with, that there's no question that you can use bifurcation when the issue that's being deferred does not predominate. So Bertulli is actually a perfect example. All of the issues about liability were common and predominated. The only issue that was not common was damages. And true, some cases have said that is alone enough. And I think in this, but that's probably something that's closer to a discretion call for the district court. The problem here is that the individualized issues would swamp the common issue of whether Arkema breached the duty of care and would have to be tried 20,000 times. And Mr. Zakharoff is basically saying, oh, that won't happen because once you put the gun to their head by affirming the classification, they'll just settle. But the Supreme Court made clear in dupes that you can't rely on depriving the defendant of their due process rights in order to uphold. Are you saying there are 20,000 issues of liability? When we're talking just about liability, are you saying there are 20,000 different iterations of liability? There would be, for all the reasons we discussed in the first 15 minutes, injury, causation, exposure are all elements of the causes of action. I mean, can't you put them into groups? Once causation is established or not established, I mean, that's the key thing. And then you put them in groups by their injuries. Well, causation is about did they have a contaminant of concern on their property in excess of background level that came from the facility, which requires excluding all of the alternative causes. That can't be done through any kind of group proof. Every property is different. They're located in different places. And I quickly touch on the Trinity. That's an air dispersion model, not an air disposition model. It's about where the particles were in the air, not where they would have fallen on the ground. There are about six different variables that govern where they might fall that were not addressed by either Trinity or the plaintiffs, which include the height of the plume, the temperature, the mass of the particles, the wind speed, the wind direction. None of that was modeled. So they are mistaken in insisting that they can rely on the Trinity model. And if the judge had actually looked hard at the evidence, because we had experts that explain this, there would be no way he could have concluded that. Now, I want to touch on what the actual predominant standard is in this circuit. This court has said over and over again that for the issues to predominate, predominance can't be satisfied if the case would degenerate into a series of individual trials, which is exactly what would happen here. All that Mr. Zakharoff is saying is that, well, we're just going to kick the can down the road into a second phase, but it's still going to be 20,000 trials. And this court has, and I think you alluded to it, this court said in the Robinson case and in the Madison case, that you can't just have a trial plan that says, we'll certify now and tell you how we're going to do it later. And I think if I could bridge to a point I couldn't reach during the first 15 minutes, one of the problems with the B2 class is that they never established that everybody in the class would have the same interest in medical surveillance and remediation, both of which are intrusive remedies. There is no evidence that, first of all, they never said what it would look like, which violates this court's specificity requirement, which was articulated in Maldonado and I'm blanking on the second case, but there are two cases. So they never said what it would look like, but they also never put in any evidence that people throughout this class area would all want to be kicked out of their homes for three days or to have their yards dug up or to be subjected to medical tests. So the cohesiveness standard B2 wasn't satisfied and can't be satisfied by this trial plan. Okay. Thank you, counsel. We have your argument. We appreciate the arguments of both counsel today, which were helpful to the court. This case is submitted. We will take a 10-minute break before considering the next case for the day. Thank you.